**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

LEXMARK INTERNATIONAL, INC.                    Civil Action No.1: 10-CV-564

    Plaintiff,                    Judge Michael R. Barrett

  v.

INK TECHNOLOGIES PRINTER SUPPLIES,
LLC, ET AL.

    Defendants.

**OPINION AND ORDER**

   This matter is before the Court on Defendant Impression Products, Inc.'s Second Motion

to Dismiss.  (Doc. 395).  Plaintiff Lexmark International, Inc. has filed a response in opposition

(Doc. 431), and Defendant Impression Products, Inc. has filed a reply (Doc. 434).  Plaintiff

Lexmark International, Inc. also has filed a surreply (Doc. 440-1), and Defendant Impression

Products, Inc. has filed a response to the surreply (Doc. 450).[1]  This matter is now ripe for

review.

**I.  BACKGROUND**

   This case concerns the alleged infringement of Plaintiff Lexmark International, Inc.'s

("Lexmark") patented toner cartridges.  Lexmark contends that the infringement includes

cartridges offered under its Return Program, although the allegations in the Second Amended

Complaint do not specifically identify the Return Program cartridges as being at issue.

   In its opposition brief, Lexmark claims that it offers customers two options when

purchasing a cartridge:  (1) a cartridge subject to a combination single-use patent and contract

license (a "Return Program cartridge," previously referred to as a "Prebate cartridge"), or (2) a

---

[1] The Court previously granted the motion for leave to file a surreply, deeming the surreply and the opposition filed.
(*See* Doc. 440-1; Doc. 450).

regular cartridge without any restrictions on its use. According to Lexmark, the purchasers of the Return Program cartridge receive an up-front discount on the purchase price of the cartridge in exchange for agreeing to use the cartridge only once, and to return the empty cartridge to Lexmark for remanufacturing or recycling.

Instead of focusing on the lack of specific allegations in the Second Amended Complaint, Defendant Impression Products, Inc. ("Impression Products") seeks dismissal of the claims on the basis that the Return Program is invalid under patent law.

## II.    LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). "[T]o survive a motion to dismiss[,] a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 1974, 167 L. Ed. 2d 929 (2007)). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

## III.    PARTIES' ARGUMENTS

2

Impression Products contends that the Return Program is invalid under patent law. In support, it relies upon *Static Control Components, Inc. v. Lexmark International, Inc.*, 615 F. Supp. 2d 575 (E.D. Ky. Mar. 31, 2009) ("*Static Control II*"), where the Eastern District of Kentucky reversed its prior decision, holding that the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008), now required it to find that Lexmark's Return Program (then known as the Prebate Program) is invalid. Impression Products contends that the Court should follow that decision.

In response, Lexmark contends that *Static Control II* was erroneously decided because *Quanta*, 553 U.S. 617, did not determine that all post-sale restrictions were invalid. Lexmark contends that its single-use licenses granted to consumers under the Return Program are enforceable, relying on multiple cases including *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992).

In its reply, Impression Products argues that Lexmark is attempting to enforce a single-use restriction intended solely for the purpose of preventing competition, and it does not indicate that the consuming public is ever made aware of the fact that purchasing products are subject to a single-use restriction. *Static Control II* is the only decision post-*Quanta* to consider the validity of the Return Program, and in that case, the district court found the Return Program invalid. Impression Products claims that all of the cases relied upon by Lexmark are distinguishable and do not make the Return Program valid and enforceable.

Lexmark argues in its surreply that Impression Products concedes that *Mallinckrodt*, 976 F.2d 700, controls in regards to use-based restrictions, that there is no Federal Circuit precedent indicating *Mallinckrodt* was overruled, that Impression Products improperly relies on matters

outside the pleadings, and that Impression Products improperly speculates as to the reasons Lexmark implemented its Return Program.

Impression Products argues in its opposition to the surreply that *Mallinckrodt*, 976 F.2d 700, does not stand for the proposition that any and all post-sale restrictions are legal and enforceable. It argues that Lexmark's Return Program is plainly implemented for improper purposes.

## IV.  ANALYSIS

The issue presented is whether the Return Program is invalid as a matter of law. Having considered the relevant caselaw and the briefings of the parties, the Court finds that Lexmark's patent infringement claims are barred as a matter of law by the doctrine of patent exhaustion and must be dismissed.

The issue of patent exhaustion in regards to conditional sales and licenses is not a new one. Courts have been grappling with the issue since as the mid-19th Century when the Supreme Court rendered its decision on patent exhaustion in *Bloomer v. McQuewan*, 55 U.S. 539, 549, 14 L. Ed. 532 (1853). The question before the Supreme Court was whether purchasers of licenses to sell or use the planning machines for the duration of the original patent term could continue to use the licenses through the extended term. *Id.* at 548. The Supreme Court held that the extension of the patent term did not affect the rights already secured by purchasers who bought the item for use "in the ordinary pursuits of life." *Id.* at 549; *see also Quanta*, 553 U.S. at 625. In reaching that decision, the Supreme Court recognized the distinction between purchasers of the right to manufacture and sell patents articles and end users of those articles. It explained:

> The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is that he obtains by the patent. And when he sells the exclusive privilege of making or vending it for use in a particular place, the purchaser buys a portion of the franchise which the

patent confers. He obtains a share in the monopoly, and that monopoly is derived from, and exercised under, the protection of the United States. And the interest he acquires, necessarily terminates at the time limited for its continuance by the law which created it. The patentee cannot sell it for a longer time. And the purchaser buys with reference to that period; the time for which exclusive privilege is to endure being one of the chief elements of its value. He therefore has no just claim to share in a further monopoly subsequently acquired by the patentee. He does not purchase or pay for it.

But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life, stands on different ground. In using it, he exercises no rights created by the act of Congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in his way. And when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress. And if his right to the implement or machine is infringed, he must seek redress in the courts of the State, according to the laws of the State and not in the courts of the United States, nor under the law of Congress granting the patent. The implement or machine becomes his private, individual property, not protected by the laws of the United States, but by the laws of the State in which it is situated.

*McQuewan*, 55 U.S. at 549-50.

Numerous decisions concerning patent exhaustion in relation to sales and licenses have followed *McQuewan*. Rather than revisiting every one of those relevant opinions here, the Court briefly summarizes only the most relevant of the cases relied upon by the parties in their briefings.

The first post-*McQuewan* case to consider is *General Talking Pictures Corporation v. Western Electric Company*, 304 U.S. 175, 58 S. Ct. 849, 82 L. Ed. 1273 (1938). In that case, a patent owner licensed another company the right to manufacture and sell patented sound amplifiers only for private, non-commercial use. *Id.* The licensee, however, knowingly sold the amplifiers to a commercial user, who also was aware that the sale was outside the scope of the license. *Id.* at 180. The Supreme Court explained that patentees may restrict their licensees to certain uses of licensed technology as long as the restrictions do not "extend the scope of the

5

monopoly." *Id.* at 181.  Given that the licensee sold the patented product in violations of the field-of-use restriction, the sale was unauthorized and did not result in patent exhaustion.  *Id.* Both the licensee and the purchasers were thus found to be bound by the restriction.  *Id.* at 180-81.

Although multiple cases followed *General Talking Pictures*, the Court moves forward in time to the decision in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 701 (Fed. Cir. 1992), which is central to the parties' dispute.  There, the Federal Circuit held that a "single use only" restriction, which  accompanied the first sale of a device from the patent owner directly to hospitals and that required disposal of the device after the first use, was a valid and enforceable license.  *Id.*  It reasoned that generally, "any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the [patented] article, will be upheld by the courts."  *Id.* at 703. In reaching that decision, the circuit court considered multiple prior cases.  *Id.* at 704-07.  Based upon the totality of those cases, the circuit court determined the fact that "a restrictive license is legal seems clear."  *Id.* at 704 (citing *Mitchell v. Hawley*, 83 U.S. 544, 21 L. Ed. 322).  "[T]he patentee may grant a license upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure."  *Id.* at 704-05 (internal quotations omitted).  "Unless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law), private parties retain the freedom to contract concerning conditions of sale."  *Id.* at 708 (internal citation omitted).   Thus, according to the Federal Circuit, if the restriction is found to "be reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims, that ends the inquiry."  *Id.* at 708. If the inquiry leads "to the conclusion that there are anticompetitive effects extending beyond the

6

patentee's statutory right to exclude, these effects do not automatically impeach the restriction" as anti-competitive effects that are not *per se* violations of law "are reviewed in accordance with the rule of reason." *Id.*[2]

The Ninth Circuit's decision in *Arizona Cartridge Remanufacturers Association Inc. v. Lexmark International, Inc.*, 421 F.3d 981 (9th Cir. 2005) that followed *Mallinckrodt* specifically concerned Lexmark's Prebate Program. In that case, the circuit court considered whether Lexmark's advertising of its Prebate Program under which it gave purchasers an up-front discount in exchange for an agreement to return the empty cartridge to Lexmark for remanufacturing mislead customers into thinking the post-sale restriction was enforceable. *Id.* The plaintiff did not challenge the district court's holding that Lexmark's patent rights were not exhausted because it "could condition the use of its patented Prebate cartridges by consumers under the principle articulated by the Federal Circuit in *Mallinckrodt, Inc. v. Medipart, Inc.*, which held that a restriction on a patented good is permissible as long as it is 'found to be reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims.'" *Arizona Cartridge*, 421 F.3d at 986 (quoting *Mallinckrodt*, 976 F.2d at 708). Nor did it argue that Lexmark acted beyond the scope of its patent. *Id.* Instead, it challenged whether Lexmark had a valid contract with the consumers of its product. *Id.* at 987. The circuit court determined that Lexmark presented sufficient unrebutted evidence that it had a facially valid contract because the language on the outside of the cartridge package specified the terms under which the consumer could purchase the item, which the consumer could read prior to

---

[2] This is the concept of patent misuse. The *Mallinckrodt* court noted that the defense requires a factual determination as to whether the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market. 976 F.2d at 706 (citing *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995 (Fed. Cir.), *cert. denied*, 477 U.S. 905, 106 S. Ct. 3275, 91 L. Ed. 2d 565 (1986)).

determining whether to purchase the product.  *Id.*  It distinguished that case from instances in which the consumer did not have notice of the condition at the time of purchase.  *Id.* at 987 n. 6.

The Lexmark Prebate Program next was addressed in *Static Control Components, Inc. v. Lexmark International, Inc.*, 487 F. Supp. 2d 830, 846-48 (E.D. Ky. 2007) ("*Static Control I*"), where the district court held that Lexmark's Prebate Program survived summary judgment due to the valid restrictive licenses contained on the packaging of the prebate cartridges.   In so holding, it rejected the notion that the sale of the cartridges to the middlemen before the end user who is bound by the Prebate Program agreement constituted an unrestricted sale that exhausted the patent rights of Lexmark.  *Id.* at 847.   The district court relied, in part, on the Federal Circuit's guidance in *Mallinckrodt* that the legality of restrictive licenses "seems clear."  *Id.* at 848-49 (citing *Mallinckrodt*, 976 F.2d at 704).

Following *Static Control I*, the Supreme Court granted certiorari in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008), to consider whether the license agreement for computer technology patents of LG Electronics precluded exhaustion of the patent rights of LG Electronics.  LG Electronics had prevailed before the Federal Circuit on the basis that the agreement between LG Electronics and Intel imposed express conditions on the licensed products, that Quanta had express notice that Intel's sales were conditional, and that the conditions survived exhaustion under *Mallinckrodt*.  *See LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1370-71 (Fed. Cir. 2006).   The Supreme Court, however, did not expressly reference *Mallinckrodt* in its decision, holding that the License Agreement and Master Agreement between LGE and Intel were dispositive.  *Quanta*, 553 U.S. 636-38.   It reasoned that the License Agreement and the Master Agreement were independent instruments, and the requirement that Intel notify its customers of use restrictions appeared only in the Master

Agreement. *Id.* at 636. That restriction thus did not affect Intel's rights under the License Agreement, which imposed no conditions on Intel's ability to sell to consumers. *Id.* at 636-37. As such, the Supreme Court determined that the agreements broadly authorized Intel to sell the licensed products without restrictions or conditions such that the patent rights were exhausted, even though Quanta was aware of the condition. *Id.* at 637-38. In so holding, the Supreme Court stated: "The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Id.* at 638.

After *Quanta*, the *Static Control I* decision was reconsidered by the district court. In *Static Control II,* 615 F. Supp. 2d at 582, the district court held that *Quanta* represented a change in the law of patent exhaustion that broadened the understanding of patent exhaustion, and whereby a patent-based use restriction through post-sale prebate terms was invalidated. In reaching its decision, the district court considered *Quanta* as well as numerous other Supreme Court cases concerning patent exhaustion. *Id.* at 578-84. Upon consideration, the district court believed that the caselaw "reveals that the Court has consistently held that patent holders may not invoke patent law to enforce restrictions on the post-sale use of their patented products" and that after "the first authorized sale to a purchaser who buys for use in the ordinary pursuits in life, a patent holder's patent rights have been exhausted." *Id.* at 582. Applying those concepts to the Prebate Program, the district court determined that Lexmark "attempts to reserve patent rights in its products through post-sale restrictions on use imposed on its customers[,]" which is "what *Quanta* says Lexmark cannot do." *Id.* at 584. The district court noted a distinction between a condition on the right to sell, as was at issue in *Quanta*, and a post-sale condition on use, like the Prebate Program, stating that the sales of Lexmark cartridges exhausted Lexmark's patent rights

and stripped its ability to control post-sale use of the cartridges through patent law. *Id.* at 585. Based upon that analysis, the district court noted its belief that *Quanta* overruled *Mallinckrodt* sub silentio. *Id.* On appeal, however, the Sixth Circuit declined to decide the validity of the Prebate Program, noting that the question was extremely complex and unsettled, and that its resolution would not be relevant to the outcome of the appeal. *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 421 (6th Cir. 2012).

In *Princo Corporation v. International Trade Commission*, 616 F.3d 1318 (Fed. Cir. 2010), *cert. denied*, 2011 U.S. LEXIS 3703 (May 16, 2011), the Federal Circuit considered the doctrine of patent misuse in the context package licenses containing field-of-use restrictions for recordable compact discs and rewritable compact discs. Philips and Sony offered patent licenses to make the CD-R or CD-RW discs with a field-of-use restriction that limited the licensees to using the licensed patents to produce discs according to the Orange Book standards. *Id.* at 1322. Explaining that patent misuse in the licensing context is a doctrine that limits a patentee's right to impose conditions on a licensee that exceed the scope of the patent, the circuit court determined that it did not bar the intervenor from enforcing patent rights against Princo. *Id.* at 1322, 1328. In reaching its decision, the circuit court relied upon *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419 (Fed. Cir. 1997) and *Mallinckrodt*, 976 F.2d 700, in explaining the rationale underlying the doctrine:

> As a general matter, the unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter, on the theory that the patentee has bargained for, and received, the full value of the goods. That "exhaustion" doctrine *does not apply, however, to a conditional sale or license*, where it is more reasonable to infer that a negotiated price reflects only the value of the "use" rights conferred by the patentee. Thus, express conditions accompanying the sale or license of a patented product, such as field of use limitations, are generally upheld. . . . . When those contractual conditions violate public policy, however, as in the case of price-fixing conditions and tying restraints, the underlying patents

> become unenforceable, and the patentee loses its right to sue for infringement or breach of contract.

*Princo*, 616 F.3d at 1328. The circuit court further recognized that the scope of the patent misuse doctrine is narrow because "the patent grant entitles the patentee to impose a broad range of conditions in licensing the right to practice the patent[.]" *Id.* at 1329.[3]

Here, the Court is persuaded to follow the reasoning of the district court in *Static Control II*. Consistent with the *Static Control II* court's analysis, this Court's review of the relevant caselaw does not reflect an endorsement by the Supreme Court of post-sale use restrictions once goods are placed into the ordinary stream of commerce. *See Static Control II*, 615 F. Supp. 2d at 578-83 (explaining relevant caselaw). Further, the Court cannot square the *Quanta* decision with the facts alleged by Lexmark as to its Return Program. In *Quanta*, the consumers had notice of the conditions of the sale, yet the Supreme Court still held that the patent rights of LG Electronics had been exhausted after the first unrestricted authorized sale by its licensee Intel. Those facts parallel this case. Lexmark does not allege that the authority of the sellers of the Return Program cartridges were restricted or conditioned in any way. In other words, the facts alleged by Lexmark do not suggest that the sellers had anything other than full authority to sell the Return Cartridges that practiced Lexmark's patents. Instead, Lexmark alleges only that the Return Program cartridges contained notices of a license restriction which bound the ultimate purchaser. Under *Quanta*, those post-sale use restrictions do not prevent patent rights from being exhausted given that the initial sales were authorized and unrestricted. Thus, to the extent that

---

[3] Although Lexmark also cites to *Monsanto Company v. Bowman*, 657 F.3d 1341, 1347 (Fed. Cir. 2011) and *Fujifilm Corp. v. Benum*, 605 F.3d 1366, 1371-72 (Fed. Cir. 2010), those cases are not helpful to the analysis of this issue. *Monsanto* cited *Mallinckrodt* only when explaining the Federal Circuit's reasoning in two cases decided pre-*Quanta*. *Monsanto*, 657 F.3d at 1347. Its decision, however, did not endorse those principles, holding that even if the patents had been exhausted as to the first generation self-replicating seeds, no authorized sale had occurred to exhaust the right in the second generation seeds. *Id.* As for *Fujifilm*, it considered *Quanta* in regards to the territorial requirement for patent exhaustion, which is not the issue presently before the Court. *Fujifilm*, 605 F.3d at 1371-72.

*Mallinckrodt* holds that such post-sale use restrictions preclude patent exhaustion after an authorized sale, the Court agrees with the *Static Control II* court that *Mallinckrodt* was overruled by *Quanta* sub silentio. *See Ninestar Tech. Co. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378 (Fed. Cir. 2012) (suggesting that an appellate court decision should not be found overturned by new Supreme Court precedent unless it is plainly inconsistent with that precedent); *Fujifilm Corp. v. Benum*, 605 F.3d 1366, 1371 (Fed. Cir. 2010) (similar to *Ninestar*); *Static Control II*, 615 F. Supp. 2d 575 (E.D. Ky. 2009) (similar to *Ninestar*). Although the Court recognizes that *Princo* cited to *Mallinckrodt* with approval in considering the doctrine of patent misuse, that case concerned license restrictions that limited the use of the patent to manufacture and produce the product in accordance with certain standards. It did not concern products that had been placed into the stream of commerce for use in ordinary pursuits in life. *Princo*'s reliance on *Mallinckrodt* thus does not demonstrate a continued endorsement of it in regards to the type of post-sale use restrictions at issue in this case.

A contrary holding would not only be inconsistent with *Quanta*, but would also create significant uncertainty for downstream purchasers and end users who may continue to liable for infringement even after an authorized sale to the consumer has occurred. Therefore, the Court is persuaded that the fully authorized sales of the Return Program cartridges to consumers for use in the ordinary pursuits in life took the cartridges outside the scope of the patent monopoly despite the notices contained on those cartridges, and Lexmark may not now rely on patent law to hold Impression Products liable for infringement.

## V.     CONCLUSION

For the foregoing reasons, Impression Products' Second Motion to Dismiss (Doc. 395) is **GRANTED**. The infringement claims against Impression Products based upon the Return Program cartridges are hereby **DISMISSED**.

**IT IS SO ORDERED**.

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court
